UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____
Leslie Czemerda,                             )
                                             )
                                             )
                                             )
             Plaintiff,                      )    Case No. CCB-11-CV-3244
                                             )
v.                                           )
                                             )
Barcoding, Inc.                              )
                                             )
             Defendant,                      )
                                             )
                                             )
                                             )
_____)

## AMENDED COMPLAINT

NOW COMES Plaintiff, Ms. Leslie Czemerda (herein referred to as "Czemerda", "Plaintiff") by way of her attorney, Morris E. Fischer, Esq. and brings action against the U.S. Department of Commerce for reasons therefore states, that at all times mentioned in this complaint:

## Preliminary Statement

This is an action by Plaintiff Leslie Czemerda to redress actions taken individually and collectively by Defendant, Barcoding, Inc. ("Barcoding", "Defendant") based on Title VII of the Civil Rights Act of 1964, and 42 U.S.C.S. § 2000e *et seq,* and the Maryland Civil Rights Code.

## Jurisdiction and Venue

1. This Court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, and 42 U.S.C.S. § 2000e *et seq,* and the Maryland Civil Rights Code.

2. Defendant Barcoding, Inc. is a Maryland corporation providing services to the citizens of the State of Maryland, with its principle place of business located in Towson, MD.

3. There is an actual controversy between Plaintiff and Defendant.

4. Plaintiff timely filed an EEOC complaint.

5. In August, 2011, Plaintiff received a right to sue from the EEOC.

6. On November 14, 2011, Plaintiff filed her complaint.

7. Plaintiff has met all of the administrative prerequisites.

8. Upon information and belief, Defendant, the Department of Commerce, is a federal agency located in Washington, DC.

9. At all times relevant to this case, Defendant has been an employer and has engaged in an industry affecting commerce, has employed fifteen or more employees, and otherwise has been an employer, within the meaning of 42 U.S.C. Sec 2000e(b).

10. Plaintiff was hired by Respondent, which is headquartered in Baltimore, Maryland, in December of 2009 to the position of Account Manager for the Southeast region.

11. Throughout Plaintiff's employment with respondent, Plaintiff has performed her job functions in a highly competent manner and has never been warned of poor performance.

12. Not even one month into Plaintiff's position, she began being subjected to blatant sexual harassment by a member of Barcoding's senior management team, Kenneth Currie, Director of Business Development and Marketing.

13. In late January of 2010, Plaintiff attended a Company sponsored dinner.

14. Plaintiff's supervisor, Frank Miller, Mr. Currie and several colleagues were in attendance at said dinner.

15. Mr. Currie sat next to Plaintiff at the dinner.

16. Mr. Currie physically pulled Plaintiff's chair close to his at the dinner.

17. Mr. Currie placed his arm around Plaintiff at the dinner.

18. Mr. Currie touched the Plaintiff's arm at the dinner.

19. Mr. Currie touched the Plaintiff's leg at the dinner.

20. Mr. Currie repeatedly whispered in Plaintiff's ear throughout the dinner.

21. When the dinner ended, the male executives left to "go out" and excluded the female executives from their engagement.

22. Following the dinner, Plaintiff complained to Mr. Miller regarding Mr. Currie's conduct.

23. Mr. Miller failed to appropriately address Plaintiff's concerns and instead advised Plaintiff that Mr. Currie had a great deal of influence over her and Mr. Steinmetz, the President and CEO, and as a result, Plaintiff needed to "stay on [Mr. Currie's] good side" and "just try to avoid him."

24. In February of 2010, Plaintiff returned to Baltimore for work, and as required by company policy, stayed at a condominium owned by Barcoding.

25. Plaintiff had heard there had been a number of parties held there where upper-level management, including Mr. Steinmetz and Mr. Currie had been in attendance, where there was allegedly drug use and sexual activities with different women.

26. While Plaintiff stayed at the condominium, Mr. Currie called and asked Plaintiff to come to the condominium to have breakfast with him.

27. Plaintiff refused to have breakfast with Mr. Currie.

28. Over the next several months, Plaintiff did not work with Mr. Currie as frequently as she had previously, however he continued to act inappropriately towards her through several phone calls.

29. Mr. Currie left messages on Plaintiff's voice mail to the effect of: "You must think I'm a stalker;" and "I'm glad you didn't answer last night, as I got pretty drunk and who knows what would have happened."

30. After receiving a number of these inappropriate messages, Plaintiff again complained to Mr. Miller.

31. Plaintiff was again discouraged from pursuing Plaintiff's complaints further and nothing was done to address the behavior.

32. Beginning in August of 2010, Plaintiff became responsible for an increased number of accounts and consequently began working with Mr. Currie on a frequent basis.

33. After that time, the sexual harassment escalated significantly.

34. Mr. Currie repeatedly called Plaintiff while he was traveling and made inappropriate comments and suggestions.

35. On or about August 9, 2010, Mr. Currie called Plaintiff from Atlanta and told her that she should "come down and party with [him]."

36. Mr. Currie called Plaintiff from Fort Lauderdale, Florida.

37. During said phone call, Mr. Currie proceeded to tell Plaintiff that, after thinking about the most important thing to him, himself, he was thinking about Plaintiff and that Plaintiff should be joining him on some of his trips.

38. On September 22, 2010, Plaintiff called Mr. Currie to discuss an unresponsive vendor.

39. During said phone call, Plaintiff began the conversation with "I need your help."

40. Mr. Currie responded, "although I have given up my gynecological practice, I would still be willing to fit you in for a pap smear while you're in Baltimore next week."

41. Plaintiff immediately called Mr. Miller and advised him of Mr. Currie's comment.

42. In response, Mr. Miller claimed he would speak with Mr. Currie and keep him away from Plaintiff.

43. The sexual harassment only continued after the aforesaid conversation between Plaintiff and Mr. Currie.

44. On or about September 29, 2010, Plaintiff attended a team building event for the sales team at a bowling alley at which Mr. Currie was in attendance and again behaved inappropriately towards Plaintiff.

45. When Mr. Currie went to leave the bowling alley, he came over to where Plaintiff was sitting.

46. Mr. Currie then proceeded to place his hands on Plaintiff's thighs.

47. Mr. Currie then told Plaintiff he was leaving.

48. Mr. Currie then told Plaintiff to call if Plaintiff needed him.

49. On or about October 6, 2010, Mr. Currie called Plaintiff from the airport on the way to a meeting in Greenville, South Carolina.

50. During said phone call, Mr. Currie suggested that he blow off the meeting and drive to Plaintiff's home.

51. During said phone call, Mr. Currie suggested that he blow off the meeting and drive to Plaintiff's home so he could "hang out with [Plaintiff]" at the beach.

52. On October 7, 2010, Plaintiff was on a telephone conference with Mr. Currie and two colleagues from a partner called Countermind.

53. During said phone conference the partner from Countermind offered to do a portion of an RFP.

54. In response to said offer, Mr. Currie said to "thank him," he would fly the partner out to Vail and give him a "blow job."

55. Other co-workers and customers are aware of Mr. Currie's behavior and have faced similar issues.

56. Plaintiff was warned early on by Ms. Mikesell that Mr. Currie "hits on anything that moves."

57. Plaintiff was told by a co-worker that Mr. Currie had relayed a story to a colleague about watching his sister having sex with one of his friends and then publicizing it to a number of people.

58. Plaintiff heard about a conversation in which Mr. Currie suggested that the way a co-worker could get fired would be to say something derogatory to the woman that was standing next to him and that Mr. Currie would "help [him] do it."

59. According to one vendor, Mr. Currie recently invited the vendor to his room to pick something up and the vendor was faced with an apparently naked woman in Mr. Currie's bed.

60. Other vendors have told stories of being taken out by Mr. Currie and observing him drink excessively and hit relentlessly on women. In several instances, vendors felt compelled to apologize to women around them.

61. Other women have additionally been subjected to sexual harassing and inappropriate conduct by Mr. Steinmetz, President and CEO.

62. On February 24, 2010, at a meeting in Raleigh, North Carolina, Mr. Steinmetz was drinking heavily, repeatedly using the "f" word, and telling stories to business colleagues about inappropriate conduct in college.

63. The following day, Plaintiff was advised that it was her responsibility to keep Mr. Steinmetz away from customers and to call Mr. Miller if she needed assistance in doing that.

64. On September 22, 2010, Plaintiff was in attendance at an evening sales event.

65. At said sales event, Mr. Steinmetz said in front of a vendor that Plaintiff "smelled good."

66. At said sales event, Mr. Steinmetz asked if he could "smell [Plaintiff] more and more."

67. Plaintiff walked away from Mr. Steinmetz.

68. However, Mr. Steinmetz continued to follow behind her for some time.

69. After making Plaintiff's complaints to Mr. Miller, there were a number of issues related to Plaintiff's compensation.

70. These compensation issues are in retaliation for Plaintiff's complaints to Mr. Miller and/or her rejection of the sexual advances of management.

71. Specifically, there were changes to Plaintiff's quota.

72. Additionally, Plaintiff's commission monies were not paid in a timely manner.

73. On October 11, 2010, Plaintiff's legal counsel sent a letter to Respondent ("Complaint Letter") detailing Plaintiff's good faith belief that she has been subjected to sexual harassment and retaliation.

74. Shortly after the Complaint Letter was sent, Respondent undertook and investigation.

75. The investigation was conducted at least in part by a former employee.

76. As part of the investigation, Plaintiff was questioned.

77. Plaintiff was questioned extensively.

78. Plaintiff was questioned extensively regarding the basis of her claims.

79. Defendant did not tell Plaintiff which other persons were or were not interviewed.

80. After the investigation, Plaintiff was advised that the company took disciplinary action against Mr. Currie.

81. Plaintiff was not advised of any disciplinary actions being taken against Mr. Steinmetz.

82. Mr. Currie has been permitted to remain employed as of November 11, 2011.

83. Mr. Currie never apologized to Plaintiff for his conduct.

84. Since Plaintiff's Complaint Letter, she has been subjected to further retaliation in that:
    a. Plaintiff's supervisor, Mr. Miller, infrequently interacted with Plaintiff and failed to respond to her in a timely manner.
    b. Plaintiff has been directed to split certain commissions with Ms. Mikesell, thereby substantially decreasing Plaintiff's commissions; and
    c. Plaintiff has generally been alienated from co-workers and managers.

85. Following Plaintiff's repeated complaints, Defendant began taking Plaintiff's clients away from her.

86. Following Plaintiff's repeated complaints, Defendant gave away Plaintiff's accounts in her territory to other representatives.

87. As a result, Defendant changed the terms, conditions and/or benefits of Plaintiff's employment.

88. As such, Defendant constructively terminated Plaintiff February 11, 2011.

89. Defendant's conduct was willful and malicious towards Plaintiff.

**FIRST CAUSE OF ACTION**
**GENDER DISCRIMINATION**
**SEXUAL HARASSMENT**

Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if herein and states:

90. Pursuant to Title VII of the Civil Right Act of 1964 (Title VII), it is an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions or privileges of employment because of such individual's sex.

91. The Defendant is vicariously liable for the behavior of said employees.

92. The Defendant is also liable in that it failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior.

93. Plaintiff attempted to prevent the sexual harassment from reoccurring by complaining to the company about it.

94. The actions of Defendant, by and through its agents, servants and employees, constituted unlawful sexual harassment.

95. The actions of Defendant by and through its agents, servants and employees, constituted gender discrimination.

96. Gender was the motivating factor that the company treated the Plaintiff in the matter it did.

97. Gender was a motivating factor that the company treated the Plaintiff in the matter it did.

98. Defendant, by and through its aforementioned employees, Kenneth Currie, Frank Miller, and others, created and perpetuated a hostile work environment for Plaintiff on the basis of her gender.

99. Said hostile environment included threatening remarks, physical touching, and a pervasive and offensive sexuality in the office environment, unwanted by Plaintiff.

100. The harassment was objectively and subjectively sufficiently severe enough to alter the terms and conditions of employment.

101. As a direct result of Defendant's actions and omissions, Plaintiff suffered monetary and non-monetary damages.

102. Plaintiff has also suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, depression and other damages as a direct result of Defendant's acts and omissions.

WHEREFORE, Plaintiff prays that she be awarded the following relief: (a) $300,000.00 for pain and suffering; (b) $500,000.00 for back pay; (c) attorneys' fees; (d) $1,200,000.00 in Punitive damages, and (e) any other relief the Court may deem proper.

## COUNT II
## SEXUAL HARRASSMENT-TANGIBLE LOSSES TO EMPLOYMENT

Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if herein and states:

103. The company's actions had a tangible effect on Plaintiff's terms and conditions of employment.

104. The actions of Defendant by and through its agents, servants and employees constituted gender discrimination.

105. Gender was the motivating factor that the company treated the Plaintiff in the matter it did.

106. Gender was a motivating factor that the company treated the Plaintiff in the matter it did.

WHEREFORE, Plaintiff prays that she be awarded the following relief: (a) $300,000 for pain and suffering; (b) $1,000,000 for back pay; (c) attorneys' fees; (d) $2,000,000 in Punitive damages, (e) interest and costs; and (f) any other relief the Court may deem proper.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII

Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if herein and states:

105. Defendant's retaliated against Plaintiff in violation of Title VII.

106. That Plaintiff engaged in protected activity when she complained of sexual harassment as stated above.

107. That Plaintiff had a reasonable belief that Defendant was engaged in an unlawful employment practice.

108. That Plaintiff had a reasonable belief that Defendant was discriminating against her based on her gender.

109. That Plaintiff reasonably believed that she was opposing a discriminatory practice.

110. That the Defendant acted adversely against the Plaintiff when it continued to harass her as stated above.

111. That the Defendant acted adversely against Plaintiff when Plaintiff's supervisor, Mr. Miller, infrequently interacted with Plaintiff and failed to respond to her in a timely manner.

112.  That the Defendant acted adversely against Plaintiff when Plaintiff was directed to split certain commissions with Ms. Mikesell, thereby substantially decreasing Plaintiff's commissions.

113.  That the Defendant acted adversely against Plaintiff when Plaintiff was generally alienated from co-workers and managers.

114.  That the Defendant acted adversely against Plaintiff when Defendant began taking Plaintiff's clients away from her.

115.  That the Defendant acted adversely against Plaintiff when Defendant gave away Plaintiff's accounts in her territory to other representatives.

116.  That the Defendant acted adversely against Plaintiff when Defendant constructively terminated Plaintiff February 11, 2011.

117.  As a result, Defendant changed the terms, conditions and/or benefits of Plaintiff's employment.

118.  That Defendant acted in a manner that would reasonably dissuade an employee from complaining about discrimination.

119.  That there is a causal connection between Plaintiff's protected activity and the aforesaid actions taken against Plaintiff.

120.  That there exists a causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff.

WHEREFORE, Plaintiff prays that she be awarded the following relief: (a) $300,000 for pain and suffering; (b) $1,000,000 for back pay; (c) attorneys' fees; (d) $2,000,000 in Punitive

damages, (e) interest and costs; (f) reinstatement into the position; and (g) any other relief the Court may deem proper.

_____/s/_____
Morris E. Fischer, Esq.
1400 Spring Street
Suite 350
Silver Spring, MD 20910
(301) 328-7631 phone
(301) 328-7638 fax
Attorney for Plaintiff

## JURY DEMAND

Plaintiff herein demands a jury for all issues to be tried in this case.

_____/s/_____
Morris E. Fischer, Esq.
1400 Spring Street
Suite 350
Silver Spring, MD 20910
(301) 328-7631 phone
(301) 328-7638 fax
Attorney for Plaintiff