# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LESLIE CZEMERDA | : |
| | : |
| v. | : Civil No. CCB-11-3244 |
| | : |
| BARCODING, INC. | : |

## MEMORANDUM

Now pending before the court is a motion for summary judgment filed by Barcoding, Inc. ("Barcoding") in this suit brought by plaintiff Leslie Czemerda ("Ms. Czemerda"). Ms. Czemerda, a former Barcoding employee, alleges hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. For the reasons stated below, Barcoding's motion will be granted.

## BACKGROUND

Leslie Czemerda was hired as the Southeast Senior Account Executive for Barcoding, Inc., in December 2009. Barcoding, which is headquartered in Baltimore, Maryland, develops and sells barcoding systems and hardware used by companies to process and record their sales, orders, shipments, and inventories. Ms. Czemerda worked out of a home office in North Carolina, selling Barcoding's products and services in North and South Carolina. She occasionally traveled to Barcoding's Baltimore headquarters for meetings and events.

In January 2010, Ms. Czemerda attended a company-sponsored dinner in Baltimore with her supervisor, Frank Miller ("Mr. Miller"); Kenneth Currie, Director of Business Development and Marketing ("Mr. Currie"); and several other colleagues. When Mr. Currie arrived at the

1

dinner, he sat down next to Ms. Czemerda, pulled her chair close to his, put his arm around her, touched her arm and leg, and whispered in her ear. (Czemerda Dep., ECF No. 47, Tab A, 129-30.) When Ms. Czemerda complained to Mr. Miller about Mr. Currie's conduct, Mr. Miller informed her that Mr. Currie had a great deal of influence over her and Barcoding President and CEO Jay Steinmetz ("Mr. Steinmetz"). (*Id.*; ECF No. 47, Ex. 23, 2.) Mr. Miller advised her to try to "stay on [Mr. Currie's] good side" and to "just try to avoid him." (ECF No. 47, Ex. 23, 2.)

In February 2010, Ms. Czemerda returned to Baltimore for a business trip. During her stay, Mr. Currie called Ms. Czemerda and asked to come to the company-owned condominium where she was staying to have breakfast with her. Ms. Czemerda informed Mr. Currie that she would not be able to have breakfast with him because she needed to try to catch an earlier flight home to avoid getting stuck in an approaching snowstorm. (*See* ECF No. 47, Ex. 25.)

Over the next several months, Ms. Czemerda worked with Mr. Currie only occasionally. Beginning in August, however, Ms. Czemerda became responsible for more accounts and as a consequence the two interacted more frequently. During that time, Mr. Currie made several comments over the phone and in voicemail messages that Ms. Czemerda considered inappropriate. On August 9, 2010, Mr. Currie called Ms. Czemerda while he was in Atlanta and suggested that she "come down and party with [him]." (ECF No. 47, Ex. 23, 3.) The next day, after several unsuccessful attempts to reach Ms. Czemerda to confer about a sales proposal, Mr. Currie left her a message in which he stated that she must think he was a "stalker."[1] (*See* ECF No. 47, Tab A, 192-93.) A day or two later, Mr. Currie called Ms. Czemerda to tell her that he was thinking about her and that she should join him on some of his trips. (*Id.* at 160.) Mr. Currie also left Ms. Czemerda another message around the same time in which he stated, "I'm glad you

---

[1] Ms. Czemerda had jokingly referred to Mr. Currie as a "stalker" earlier that day in an instant message. (ECF No. 47, 25.)

didn't answer last night, as I got pretty drunk and who knows what would have happened." (ECF No. 47, Ex. 23, 2.)

On September 22, 2010, Ms. Czemerda called Mr. Currie to discuss an unresponsive vendor. In response to Ms. Czemerda's request for help, Mr. Currie commented that "although I have given up my gynecological practice, I would still be willing to fit you in for a pap smear while you're in Baltimore next week." (ECF No. 47, Tab A, 157-58; Ex. 23, 3.) Ms. Czemerda contacted Mr. Miller to tell him about Mr. Currie's comment, and Mr. Miller responded that he would speak with Mr. Currie and keep him away from Ms. Czemerda. (ECF No. 47, Ex. 23, 3.) When Ms. Czemerda later confronted Mr. Currie about the statement being inappropriate, he laughed and stated that she was probably right. (ECF No. 47, Tab A, 158.)

On or about September 29, 2010, Ms. Czemerda attended a team building event at a bowling alley in Baltimore. Before leaving the event, Mr. Currie walked over to Ms. Czemerda, placed his hands on her knees, and told her to call him if she needed anything. (ECF No. 47, Tab A, 194.) A week later, Mr. Currie called Ms. Czemerda from the airport on his way to a meeting in South Carolina and suggested that he blow off the meeting and drive to her house to "hang out" with her at the beach. (*Id.* at 159-161.)

On October 7, 2010, Ms. Czemerda participated in a telephone conference with Mr. Currie and two representatives of Countermind, a company partnering with Barcoding. In response to a Countermind representative's offer to help with a proposal, Mr. Currie commented that, as a way of thanking the colleague, he would fly him out to Countermind's office in Vail and "give him a blow job." (*Id.* at 200-01.)

On October 12, 2010, Ms. Czemerda filed an internal complaint alleging that she had

been sexually harassed by Mr. Currie and Mr. Steinmetz.[2] Barcoding hired an independent consultant to investigate Ms. Czemerda's claims. In response to Mr. Currie's "blow job" comment during the call with Countermind, Mr. Currie was docked one week's pay. (ECF No. 47, Tab H, ¶ 11 & Ex. 2.) Ms. Czemerda resigned from her position at Barcoding on February 11, 2011 and subsequently filed a complaint with the EEOC, claiming sexual harassment and retaliation. Ms. Czemerda received a right to sue notice from the EEOC in August 2011 and filed this action on November 14, 2011.

## ANALYSIS

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

---

[2] Ms. Czemerda points to two incidents involving Barcoding CEO Steinmetz in support of her sexual harassment claim. In the first, Ms. Czemerda observed Mr. Steinmetz using profanity and telling stories to business colleagues about what she vaguely describes as inappropriate conduct during his college years. In the second, Mr. Steinmetz commented at a sales event that Ms. Czemerda "smelled good" and asked if he could "smell [her] more and more." (ECF No. 47, Ex. A, 117-23.) Mr. Steinmetz does not remember making this remark. (*See* Interview Summaries, ECF No. 56, Ex. 8, 5-6.)

4

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**Discussion**

Title VII Claims

*Hostile Work Environment*

Ms. Czemerda alleges she was subjected to a hostile work environment based on her sex. "In order to make out a hostile work environment claim based on sex, 'a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) (internal citations omitted).

The third factor is dispositive here: whether the conduct of which Ms. Czemerda complains was sufficiently severe or pervasive to alter her conditions of employment and create an abusive working environment. In determining whether conduct is sufficiently severe or pervasive, courts look to the "totality of the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

5

performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The plaintiff must show both that she "subjectively perceived the environment to be abusive" and that "the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks and citations omitted).

The Fourth Circuit has noted that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id.* Actionable conduct must be "so extreme as to amount to a change in the terms and conditions of employment." *Sunbelt*, 521 F.3d at 315 (internal quotation marks and citation omitted). Thus, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (quoting *Faragher*, 524 U.S. at 788).

Turning to the instant case, Ms. Czemerda was subject to sporadic inappropriate and offensive remarks by Mr. Currie over a period of seven months. Mr. Currie's "pap smear" comment was unquestionably offensive and unprofessional, as was his offer to give a "blow job" to another colleague in Ms. Czemerda's presence. In addition, the court does not condone Mr. Currie's repeated calls to Ms. Czemerda inviting her to spend time with him outside of work, or his touching Ms. Czemerda's arms and/or legs during two company events.[3]

Nonetheless, Mr. Currie's conduct, though inappropriate, is not so extreme as to amount to a change in the terms and conditions of employment. *Cf. Smith v. First Union National Bank*, 202 F.3d 234, 238-39 (4th Cir. 2000) (reversing the entry of summary judgment for the defendant-employer where it was shown that plaintiff's supervisor routinely directed demeaning

---

[3] The court notes that Ms. Czemerda has not alleged that Mr. Currie touched her in a manner that was unmistakably or necessarily sexual.

comments at women and told plaintiff that she should carry out his orders "or else" and that he could "see why a man would slit a woman's throat"); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (finding that male coworkers' almost daily conduct, which included repeatedly simulating sex with a mannequin, directing vulgar and sexually explicit jingles at plaintiff, and presenting her with graphic pornography, were sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive work environment); *Hoyle*, 650 F.3d at 326-27, 333-34 (concluding that evidence of photos of scantily-clad women on company toolboxes, sexually provocative calendars in communal areas, and a screensaver of a nude woman on a company computer, was sufficient to generate a genuine dispute of material fact as to whether harassment was severe or pervasive). Even crediting all of Ms. Czemerda's evidence and assuming she subjectively perceived her work environment to be offensive, no reasonable jury could find it objectively severe. Indeed, it is important to note that, for the great majority of the time Ms. Czemerda was employed by Barcoding, she did not work in the same office as Mr. Currie or have any need to be in his presence except on a few occasions. Furthermore, Ms. Czemerda has presented no evidence that the conduct of which she complains interfered with her work performance. Because Ms. Czemerda's allegations are insufficiently severe or pervasive to create an abusive working environment, her sexual harassment claim fails as a matter of law.[4]

*Retaliation*

Ms. Czemerda also claims Barcoding retaliated against her by requiring her to split commissions with another employee and reassigning two accounts to other employees after she filed an internal sexual harassment complaint. To establish a *prima facie* case of retaliation, a

---

[4] Barcoding also argues that Mr. Currie's conduct was not imputable to the company and that Barcoding exercised due care to prevent and effectively remedy sexual harassment in the workplace. Because Ms. Czemerda has failed to satisfy the third element of a hostile work environment claim, however, the court need not address these issues.

plaintiff must show that (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656 (4th Cir. 1998). If she does so, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its decision, which she must then rebut. *Id.*

While it is undisputed that Ms. Czemerda engaged in a protected activity when she filed her internal complaint, she cannot present evidence sufficient for a reasonable jury to conclude that Barcoding took any adverse action against her. An action is materially adverse if, from an objective point of view, "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). On the other hand, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington*, 548 U.S. at 68). Here, Ms. Czemerda had been required to split commissions with another employee when they collaborated on sales *prior* to her filing an internal complaint. (ECF No. 47, Tab A, 86-88; Snyder Decl., ECF No. 47, Tab F, ¶ 13.) In fact, Barcoding required other sales representatives to split commissions in similar situations. (ECF No. 47, Tab F, ¶ 13.) Moreover, Barcoding did not reassign the LabCorp account; instead, it asked another account executive who had personal connections at LabCorp to assist Ms. Czemerda in making a sale. (*Id.* at ¶ 12.) Ms. Czemerda still would have received full credit and commissions if LabCorp had awarded a contract to Barcoding. (*Id.*) Nor did Barcoding assign another account executive to handle a potential sale to Coca Cola. (*Id.* at ¶ 11.) Rather, Barcoding did not identify, pursue, or procure such an opportunity in Ms. Czemerda's territory.

(*Id.*)[5,6] Because no jury could reasonably conclude that Barcoding acted adversely against Ms. Czemerda after she filed her complaint, her retaliation claim also fails.

A separate Order follows.

July 24, 2013                                              /s/
Date                                                     Catherine C. Blake
                                                          United States District Judge

---

[5] The court also notes that Barcoding voluntarily continued to pay draw advances of $5,000 per month to Ms. Czemerda after she filed her complaint even though she consistently failed to meet her sales quotas. (ECF No. 47, Tab F, ¶ 8.)

[6] Nor can Ms. Czemerda demonstrate that Barcoding constructively discharged her. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) (plaintiff who advances a hostile-environment constructive discharge claim "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) ("Even a slight decrease in pay coupled with some loss of supervisory responsibilities, is insufficient evidence of constructive discharge.") (internal citation and quotation marks omitted).